# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 19-1953V**
Filed: March 29, 2023

|  |  |
|---|---|
| RANDY WOODROW NOLEN, | Special Master Herbrina Sanders |
| Petitioner, |  |
| v. |  |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | Decision Awarding Damages; Pain and Suffering; Lost Wages; Shoulder Injury Related to Vaccine Administration ("SIRVA"); Tetanus Diphtheria Acellular Pertussis ("Tdap") Vaccine |
| Respondent. |  |

*Frank Mell Ferrell,* Frank M. Ferrell APLC, Shreveport, LA, for Petitioner.
*Sarah Black Rifkin,* United States Department of Justice, Washington, DC, for Respondent.

## DECISION AWARDING DAMAGES[1]

On December 26, 2019, Randy Nolen filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that he suffered injuries, including but not limited to, a right shoulder injury related to vaccine administration ("SIRVA"), following a tetanus, diphtheria, and acellular pertussis ("Tdap") vaccination he received on October 5, 2018. Pet. at 1, ECF No. 1. On May 17, 2021, Respondent conceded that "compensation is appropriate because Petitioner meets the criteria for a presumed SIRVA, as defined by the Vaccine Injury Table." Resp't's Report at 5, ECF No. 19. Respondent stated that "the scope of damages to be awarded are [sic] limited to [P]etitioner's right-sided SIRVA and its resulting sequelae only." *Id.* at 6. Although a ruling on entitlement in Petitioner's favor was issued in June of 2021, the parties have been unable to resolve damages on their own. *See* ECF No. 21.

---

[1] Because this unpublished Decision contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002.  44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755.  Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

For the reasons discussed below, I find that Petitioner is entitled to an award of damages in the amount **$126,323.78, representing $125,000.00 for actual pain and suffering and $1,323.78 for unreimbursed expenses.**

## I.      Relevant Procedural History

The day after his petition was filed, on December 27, 2019, Petitioner filed several medical records. Pet'r's Exs. 1–16, ECF Nos. 6–7. On January 3, 2020, Petitioner filed a statement of completion. ECF No. 9. On May 17, 2021, Respondent filed his Rule 4(c) report conceding that Petitioner was entitled to compensation. ECF No. 19. Shortly thereafter, on May 26, 2021, Petitioner filed a functional capacity evaluation ("FCE"). Pet'r's Ex. 17, ECF No. 20-2. I issued a ruling on entitlement on June 11, 2021. ECF No. 21. The parties then attempted to informally resolve the issue of damages. *See, e.g.*, ECF Nos. 22–24, 26–30. During their discussions, Petitioner filed an expert report from a certified public accountant on July 22, 2021. Pet'r's Ex. 18, ECF No. 27. On October 7, 2021, the parties filed a joint status report stating that they "have come to an impasse and request[ing] that the Court resolve damages in this case." ECF No. 31. I ordered the parties to file briefs regarding damages on October 27, 2021. ECF No. 32.

Petitioner filed his damages brief, along with a pharmacy record and witness affidavits, on December 8, 2021. Pet'r's Exs. 20–24, ECF No. 33; Pet'r's Br., ECF No. 34. Respondent filed his responsive damages brief on January 7, 2022. Resp't's Resp., ECF No. 35. Petitioner filed his reply, including tax documents and correspondence, on February 4, 2022. Pet'r's Reply, ECF No. 36. This matter is now ripe for adjudication.

## II.      Petitioner's Diagnosis and Treatment

Petitioner's pre-vaccination history was significant for a surgery to excise a malignant melanoma[3] in 2000, and a cervical spine[4] surgery in 2011. Pet'r's Ex. 6 at 13, ECF No. 6-7. He suffered from chronic headaches and had a neurostimulator placed for pain management in 2008. *Id.* Petitioner had an active etodolac[5] prescription as of April 1, 2018, also for pain. *Id.* at 14.

---

[3] A malignant melanoma is a cancerous tumor arising from melanocytes of the skin or other organs. *Dorland's Illustrated Medical Dictionary* 1, 1125 (32nd ed. 2012) [hereinafter "*Dorland's*"].

[4] The cervical spine refers to the upper seven vertebrae, "constituting the skeleton of the neck." *Dorland's* at 1749.

[5] Etodolac is "a nonsteroidal anti-inflammatory drug used as an analgesic and anti-inflammatory, especially to treat arthritis[.]" *Dorland's* at 652.

Additionally, at the time of his vaccination, Petitioner had prescriptions for trazodone,[6] aspirin,[7] and lorazepam.[8] Pet'r's Ex. 5 at 5, ECF No. 6-6.

On October 5, 2018, Petitioner received a Tdap vaccine in his right deltoid after stepping on a nail. *Id.* at 4. Prior to vaccination, Petitioner had no documented history of right shoulder complaints. *Id.* at 6. He was sixty-four years old at the time of vaccination. *Id.* at 4.

On October 16, 2018, eleven days post vaccination, Petitioner returned to the clinic where he received his vaccine and reported a ten-day history of right arm pain. *Id.* at 6. An exam revealed severe tenderness over the right upper arm and decreased range of motion ("ROM"). *Id.* Petitioner was treated with a steroid pack. *Id.* at 7.

One week later, on October 22, 2018, Petitioner followed up with his primary care physician, complaining that he was "unable to move his arm since he was given a Tetanus [shot sixteen] days ago." Pet'r's Ex. 6 at 13. He clarified that he was "able to move his arm without difficulty[,] but movement [was] limited by pain." *Id.* Petitioner reported that the steroids prescribed by the clinic provided "only minimal relief." *Id.* Four days later, on October 26, 2018, Petitioner went to the emergency room and complained that he could not use his right arm. Pet'r's Ex. 7 at 3, ECF No. 6-8. He also reported new pain in his right wrist, a twinge in his arm, and some swelling and numbness in his face. *Id.* An x-ray revealed degeneration in the right acromioclavicular joint.[9] *Id.* at 9. A CT of the cervical spine showed mild foraminal encroachment, moderate disc space loss, and moderate-to-severe osteoarthritis on the right side. *Id.* at 13. Petitioner was administered a steroid injection and discharged. *Id.* at 5.

A November 1, 2018 EMG/NCS revealed no abnormalities. Pet'r's Ex. 6 at 26–27. On November 12, 2018, Petitioner consulted an orthopedist for his post-vaccination arm pain and weakness. *Id.* He reported occasional right ulnar numbness and a recent episode of right-sided facial numbness, which resolved after thirty minutes.[10] *Id.* A physical exam revealed tenderness over the lateral shoulder with mildly decreased ROM and strength at 4/5. *Id.* at 2–3. Petitioner was diagnosed with an unspecified shoulder injury, and he received a second steroid injection. *Id.* at 3. Two weeks later, Petitioner had a follow-up visit and reported that the injection had not helped to alleviate his symptoms. *Id.* at 4.

---

[6] Trazodone is "an antidepressant used to treat major depressive episodes with or without prominent anxiety[.]" *Dorland's* at 1957.

[7] Aspirin is acetylsalicylic acid, "a drug having anti-inflammatory, analgesic, and antipyretic effects; it is the prototype of the nonsteroidal anti-inflammatory drugs whose mechanism of action is inhibition of prostaglandin synthesis; used for relief of pain, fever, and inflammation and for treatment of arthritis, osteoarthritis, and rheumatic fever. Because it is a platelet inhibitor, it is also used to reduce the risk of recurrent transient ischemic attacks, stroke syndrome, thromboembolism following certain surgical procedures, and initial or recurrent myocardial infarction." *Dorland's* at 166.

[8] Lorazepam is "administered orally in the treatment of anxiety disorders and short-term relief of anxiety symptoms and as a sedative agent, and intravenously or intramuscularly for preanesthetic medication; used also intravenously to control status epilepticus and as an antiemetic in cancer chemotherapy." *Dorland's* at 1074.

[9] The acromioclavicular joint refers to "the synovial joint between the acromion of the scapula and the acromial extremity of the clavicle[.]" *Dorland's* at 20.

[10] Petitioner reported that the facial numbness occurred three weeks post vaccination. Pet'r's Ex. 6 at 26–27.

Petitioner saw a neurologist on November 27, 2018, who noted that Petitioner's shoulder symptoms started after a Tdap vaccine in the right deltoid but could not conclusively determine the cause of Petitioner's shoulder injury. *Id.* at 21–22. The neurologist noted that Petitioner was experiencing a high level of pain, despite "no denervation in the biceps, deltoid or the other right arm muscles tested." *Id.* at 21. The neurologist further explained that "[a]n MRI cannot be done to further assess [Petitioner's pain]" due to Petitioner's use of a nerve stimulator to treat pre-existing chronic headaches. *Id.* On exam, Petitioner had "subtle decreased sensation to pinprick in the right index finger and the lateral aspect of the right forearm, but [his] EMG was negative." *Id.* The visit record noted Petitioner's previous cervical spine surgery, but Petitioner reported that the numbness and tingling he was experiencing started post vaccination. *Id.*

On December 14, 2018, Petitioner presented to an ear, nose, and throat ("ENT") specialist for evaluation of a mass on the right side of his neck. Pet'r's Ex. 11 at 6, ECF No. 7-3. Petitioner reported that he noticed the mass around October 23, 2018, and approximately three days later, he had a brief episode of right-sided facial numbness. *Id.* A two-centimeter mobile mass was seen upon examination of the right side of Petitioner's neck. *Id.* at 8.

Petitioner returned to his orthopedist on January 7, 2019, as his shoulder symptoms had not improved. Pet'r's Ex. 9 at 6, ECF No. 7-1. Petitioner was referred for surgery. *Id.* at 6–8. Another lump appeared on the right of Petitioner's neck, and he returned to his ENT specialist on January 25, 2019. Pet'r's Ex. 11 at 36. Petitioner also reported progressing neck pain. *Id.* Petitioner underwent a biopsy that revealed no malignancies. *Id.* at 38.

On February 13, 2019, Petitioner underwent surgery, including an arthroscopic rotator cuff repair, biceps tenodesis,[11] subacromial decompression with acromioplasty,[12] and axillary nerve decompression.[13] Pet'r's Ex. 9 at 9. At a post-surgical visit one week later, Petitioner reported that his pain, swelling, and tingling had diminished. *Id.* at 11.

On February 22, 2019, Petitioner underwent a physical therapy ("PT") evaluation. Pet'r's Ex. 16 at 8, ECF No. 7-8. He reported an average pain level of 2/10. *Id.* He also explained that his pain was exacerbated by movement, causing his pain level to worsen to a 4/10. *Id.* Petitioner began regular PT sessions. *Id.*

Continued neck swelling led Petitioner to see another ENT on April 10, 2019. Pet'r's Ex. 14 at 5, ECF No. 7-6. His specialist noted, "[a] previous [fine-needle aspiration biopsy][14] showed a few 'atypical' cells, not diagnostic for malignancy; these are likely reactive related to his inflammatory reaction after his TDAP [sic] shot." *Id.* A follow-up CT on April 18, 2019, showed no abnormalities. Pet'r's Ex. 12 at 4, ECF No. 7-4. A June 2019 skin biopsy from the left side of

---

[11] Biceps tenodesis is the stabilization of the bicep muscle by "anchoring [the bicep] tendon to a bone [the shoulder], done either surgically or through the use of an orthosis." *Dorland's* at 1882.

[12] Subacromial decompression with acromioplasty is the "surgical removal of an anterior spur of the acromion to relieve mechanical compression [or pressure] of the rotator cuff during movement of the glenohumeral joint[.]" *Dorland's* at 20, 475.

[13] Axillary nerve decompression refers to the surgical removal of pressure from the axillary nerve, which is the "posterior cord of the brachial plexus [in the neck] (C5–C6)[.]" *Dorland's* at 475, 1244, 1255.

[14] A fine-needle aspiration biopsy is a biopsy wherein the tissue is obtained by the application of suction through a fine needle attached to a syringe. *Dorland's* at 218.

Petitioner's neck showed actinic keratosis[15] and superficial basal cell carcinoma.[16] Pet'r's Ex. 13 at 4, ECF No. 7-5.

Petitioner completed twenty-two PT sessions over three months, before his discharge on May 16, 2019, with a continuing at-home exercise plan. Pet'r's Ex. 16 at 101. Discharge records noted Petitioner had a 39% perceived disability and an average pain level of 3/10. *Id.* at 98, 100. The records also noted Petitioner's pain was elevated to a 6/10 when exacerbated by overuse. *See id.* At the time of discharge, his physical therapist summarized that Petitioner "ha[d] appropriate [right] scapular control with all active ROM. He continue[d] to have pain and discomfort on the [right] aspect of his neck." *Id.* at 101.

Four months post surgery, on July 1, 2019, Petitioner returned to his orthopedist for a follow-up. Pet'r's Ex. 9 at 14. Upon exam, Petitioner exhibited full ROM and 5/5 strength. *Id.* at 16. Petitioner's orthopedist noted that "after supinating [Petitioner's] forearm[, Petitioner] experienced numbness to [his] index and long fingers[.]" *Id.* at 22. The orthopedist also noted that "after reaching overhead, [Petitioner] had numbness in [his] superficial radial nerve distribution." *Id.* The treater wrote that "[b]oth numbness complaints were intermittent and resolved during [this] visit." *Id.* Petitioner reported that he had returned to work and was able to lift light objects above his head. *Id.* at 14. Petitioner has not filed any additional medical records.

### III.  Expert Filings

#### a.  Functional Capacity Evaluation ("FCE")

On April 12–13, 2021, Petitioner underwent a FCE performed by Steve Allison, D.P.T. Pet'r's Ex. 17, ECF No. 20-2. Dr. Allison has a doctorate in PT and is board certified in orthopedic PT. *Id.* at 8.

Dr. Allison listed Petitioner's diagnoses as 1) chronic right shoulder and neck pain; 2) intermittent right upper extremity cervicobrachial radiculitis;[17] and 3) a right shoulder rotator cuff tear, "axillary nerve neuritis,[18] and biceps tendon partial tear – pre-op." *Id.* at 2. The report filed by Dr. Allison included results from Petitioner's residual functional capacity testing and subsequent identification of his residual physical impairments. *Id.* at 3. Specifically, Petitioner exhibited occasional limitation when reaching overhead on the right side. *Id.* He also exhibited moderate ROM loss with left and right lateral flexion, right rotation, and right upper extremity

---

[15] Actinic keratosis is "a sharply outlined, red or skin-colored, flat or elevated, verrucous or keratotic growth that sometimes develops into a cutaneous horn or gives rise to a squamous cell carcinoma. It usually affects the middle-aged or elderly, especially those of fair complexion, and is caused by excessive exposure to the sun." *Dorland's* at 982.

[16] Superficial basal cell carcinoma is a "carcinoma usually seen on the trunk as a plaque or plaques that are superficial, slowly spreading, erythematous, and scaly, and have threadlike, raised borders." *Dorland's* at 293.

[17] Cervicobrachial radiculitis is "inflammation of the root of a [cervical] and spinal nerve, especially of that portion of the root that lies between the spinal cord and the intervertebral canal." *Dorland's* at 1571.

[18] Axillary nerve neuritis is "inflammation of [the axillary] nerve, with pain and tenderness, anesthesia and paresthesias, paralysis, wasting, and disappearance of the reflexes[.]" *Dorland's* at 1263.

("RUE") abduction. *Id.* Dr. Allison addressed Petitioner's occupation and wrote that as a result of his injury, Petitioner "is now limited to safely participating in fulltime work falling within a restricted range of medium physical demand[.]" *Id.* at 7. He noted this included Petitioner's current fulltime position as a job site supervisor. *Id.* However, Dr. Allison noted that with respect to Petitioner's work as a house repairer, Petitioner "has a loss of work capacity and he is not capable of safely returning to [that type of] work." *Id.* Dr. Allison advised Petitioner "not [to] return to any type of work activity or participate in any other life activities that will aggravate or worsen his condition." *Id.* Dr. Allison noted that Petitioner's "condition has been present for more than [two and a half] years[.]" *Id.* at 8. He therefore opined that Petitioner's "prognosis for any significant improvement in function is poor." *Id.* Dr. Allison advised Petitioner to "allow pain to be his guide with returning to any future work activity and with participation in other life activities." *Id.* at 7.

### b. Forensic Accountant Expert Report

Certified public accountant Chad M. Garland completed a report detailing Petitioner's lost compensation as a result of his SIRVA. Pet'r's Ex. 18, ECF No. 27-2. Mr. Garland explained that "[w]age inflation and discounting were used to calculate [Petitioner's] total lost compensation for the remainder of his expected worklife [sic]." *Id.* at 2. Based on a work life expectancy of seven years, or alternatively, Petitioner's stated intention to work for an additional ten years (prior to his SIRVA), Mr. Garland determined Petitioner's total lost compensation is estimated to be $132,761.20 or $189,229.58, respectively. *Id.* Mr. Garland "used the average wages from [Petitioner's] 2015, 2016, and 2017 earnings as reported on his tax returns[]" to arrive at this estimation. *Id.*

## IV.   Affidavits

Petitioner filed a personal affidavit in support of his request for damages. Pet'r's Ex. 24, ECF No. 33-5. He recounted his vaccination, injury, treatment regimen, and then focused on his permanent physical effects. *Id.* at 5–8. He noted that the physical exam performed by his functional capacity expert that revealed permanent physical impairments extended over the course of two days and was "[n]ot a five[-]minute exam" done by his doctor. *Id.* at 6. Regarding his permanent impairments, Petitioner stated that use of his right arm "for more than a few minutes[]" causes pain and numbness. *Id.* at 5. He cannot lift objects without pain and had to relearn how to do many things with his left hand. *Id.*

Petitioner described former hobbies that he can no longer enjoy, including landscaping, swimming, gardening, golfing, and playing sports. *Id.* at 5–6. He also discussed his exercise regimen that no longer includes weight training, boxing, and mixed martial arts ("MMA"). *Id.* at 6. In addition to his hobbies, Petitioner noted he now uses a muscle relaxer to help him sleep and takes prescription pain medication daily. *Id.* He described his injury as life-altering to a greater degree than in a less active individual. *Id.* at 5–6.

The loss of income that Petitioner suffered is also described in his affidavit. *Id.* at 6. Petitioner asserted that prior to his SIRVA he "had two jobs[,]" one with JL Builders, LLC, and

his own independent contracting company, Nolen's Consulting, LLC.[19] *Id.* He admitted that since his injury, he has been able to continue full-time employment with accommodations from JL Builders. *Id.* However, he noted that there is "no guarantee that will continue." *Id.* He also listed four clients of his company, Nolen's Consulting, and stated that "[a]ll of these clients had to be released to find someone else to do their work as [he] was unable to continue doing it safely." *Id.* at 7. Petitioner described himself as "strong, self-reliant[,] and capable of performing any type of work associated with building and construction." *Id.* He continued that his "abilities have now been permanently diminished," and "there is nothing [the orthopedist] can do to improve [his] problems." *Id.*

Petitioner also filed several witness affidavits in support of his damages request. Pet'r's Exs. 21–24. Carl Lapeyrouse is Petitioner's former employer and exercise partner. Pet'r's Ex. 21 at 1, ECF No. 33-2. He described Petitioner's longing for "physically creating and building," despite having the "luxury of office attire and office management" that came with his position with Mr. Lapeyrouse. *Id.* at 2. Petitioner left his position with Mr. Lapeyrouse to work in construction. *Id.* Mr. Lapeyrouse attested to Petitioner's love of "swinging a hammer [and] getting his hands dirty." *Id.* Following Petitioner's SIRVA injury, Mr. Lapeyrouse described how Petitioner was unable to engage in boxing and MMA. *Id.* Mr. Lapeyrouse asserted that Petitioner's "decline had nothing to do with age, but 100% with his shoulder injury due to the SIRVA." *Id.*

Petitioner's wife, Lesia Nolen, also submitted an affidavit and described Petitioner's injury as "heartbreaking." Pet'r's Ex. 22 at 1, ECF No. 33-3. Mrs. Nolen noted that Petitioner suffers from pain and numbness every day. *Id.* at 3. She requested Petitioner be awarded the maximum amount for pain and suffering, $250,000.00, because this injury has "severely limited his ability to supplement [their] income by working independently aside from the work he does for JL Builders." *Id.*

Adam Lee, owner of JL Builders, submitted an affidavit on behalf of Petitioner. Pet'r's Ex. 23, ECF No. 33-4. Mr. Lee explained that he had employed Petitioner since April 1, 2018, six months prior to vaccination. *Id.* at 1. While acknowledging that post vaccination, the company "accommodated [Petitioner] . . . due to his extensive experience in the construction industry[,]" Mr. Lee noted that Petitioner "can no longer engage in actual construction and this has stopped him from doing work through his own [independent contracting] company," Nolen's Consulting, LLC. *Id.* at 2.

## V.     The Parties' Arguments

The parties agree Petitioner should be awarded $1,323.78 for recoverable out-of-pocket expenses. Pet'r's Br. at 14; Resp't's Resp. at 7. Petitioner asserts that "an award of at least [$200,000.00] for actual pain and suffering should be entered," and notes that "[a]n award for future pain and suffering could be in order as well." Pet'r's Br. at 14. Respondent disagrees that any future pain and suffering is applicable in this case and proposes a "sum of $82,500.00 for [P]etitioner's actual pain and suffering." Resp't's Resp. at 19. Petitioner also seeks an award of

---

[19] Per Petitioner's 2017 and 2018 tax documents, Petitioner's consulting company, Nolen S. Consulting LLC, also did business as Nolen S. Painting & Home Improvement and Nolen's Consulting, LLC. *See* Pet'r's Reply at 17–20 (Exhibits 1–3). I will refer to his company interchangeably with these titles.

$132,76.23 for past and future lost wages. Pet'r's Br. at 14. Respondent disputes any claim for lost wages, stating it is "wholly unsupported by the record." Resp't's Resp. at 19.

### a.  Petitioner's Arguments

In support of his request for pain and suffering, Petitioner stated that "[t]he defining elements of damages in this case center around his permanent loss of [ROM] set forth in his [FCE,] along with the permanent pain and numbness in his right arm." Pet'r's Br. at 3. Petitioner noted that "[h]e is right hand dominant[,] and these ongoing damages have adversely affected his earning capacity." *Id.* Petitioner detailed his current condition to include "daily pain in his right arm and hand, if used for more than a few minutes," neck pain, intermittent right shoulder and hand numbness, sleep disturbances, and limited ROM in his neck and arm. *Id.* at 5–6. Petitioner's FCE documented a moderate loss of physical labor abilities; however, Petitioner argued that "what is moderate to most men, those not involved in building houses, is severe to someone like [him]." *Id.* at 8. He also noted "the infliction of emotional damages resulting from [his] loss of ability to function as the primary breadwinner of the household." *Id.*

His lost wages and earnings capacity request, according to Petitioner, is supported by noted limitations in Petitioner's ability to lift heavy items and move building materials. *Id.* at 9. He described "impairments to his cervical spine with loss of ROM from 56–67% and impairment to his [RUE] at 44% loss of ROM." *Id.* Petitioner also noted the loss of "a significant source of income." *Id.* He explained that in addition to his employment with JL Builders, he owned and operated Nolen Consulting, that had previously done work for several companies he could no longer contract with. *Id.*

Petitioner compared his case to two others wherein the claimants received pain and suffering amounts of $180,000.00 and $185,000.00, respectively. *Id.* at 10–12 (citing *Hooper v. Sec'y of Health & Hum. Servs.*, No. 17-12V, 2019 WL 1561519 (Fed. Cl. Spec. Mstr. Mar. 20, 2019) (wherein the petitioner had a severe SIRVA, requiring one cortisone injection, pain medication, sixty-six PT sessions, a surgery, with only a 50% recovery); *Pruitt v. Sec'y of Health & Hum. Servs.*, No. 17-757V, 2021 WL 5292022 (Fed. Cl. Spec. Mstr. Oct. 29, 2021) (wherein the petitioner was treated for a severe SIRVA for four years, received multiple cortisone injections, and underwent two surgeries)). Regarding the first case, Petitioner conceded that his surgery was less "extensive" than that in *Hooper* but argued that the negative impact on his employment prospects was more severe. *Id.* at 10. In the *Pruitt* case, the petitioner's treatment included two surgeries, compared to Petitioner's one. *Id.* at 12. However, the *Pruitt* petitioner sustained no "continuing permanent damages with limited ROM, pain on usage[,] and serious impacts on [the] job." *Id.* Petitioner further asserted that he should receive more than the awards in *Hooper* and *Pruitt* because he suffers from permanently swollen "lymph nodes in his neck that have necessitated numerous excisions." *Id.* at 14. In total, Petitioner asserted that he should be awarded "at least" $334,085.01, calculated from the sums of $200,000.00 in actual pain and suffering, $132,761.23 in past and future lost wages, and $1,323.78 in out-of-pocket expenses. *Id.*

### b.  Respondent's Response

In response to Petitioner's request, Respondent acknowledged entitlement but asserted, "damages to be awarded are limited to [P]etitioner's right[-]sided SIRVA and its resulting sequelae

only." Resp't's Resp. at 1. Respondent scrutinized Petitioner's pain and suffering request due, in part, to "Petitioner's failure to seek treatment since July [of] 2019." *Id.* at 9. Respondent asserted that the pain medication Petitioner took to manage his continued SIRVA pain, etodolac and lorazepam, had been prescribed pre vaccination for headaches. *Id.* (citing Pet'r's Ex. 5 at 5; Pet'r's Ex. 6 at 14). There was no pharmaceutical record submitted that articulated a change in conditions being treated by these medications post vaccination. *Id.*

Respondent also disputed Petitioner's FCE results. *Id.* at 10. Noting that the FCE was completed "approximately two years after his last SIRVA treatment [in 2019]," Respondent argued that Petitioner's medical records created contemporaneously with his treatment are the best evidence of the extent of his injury. *Id.* Those records reflect a "good recovery following his arthroscopic surgery and return[] to work as of July [of] 2019." *Id.* According to Respondent, any limitations documented in a 2021 FCE do not indicate "whether [P]etitioner's symptoms have remained constant over time or whether Petitioner has suffered some intervening injury." *Id.*

Respondent further asserted that there is no viable claim for lost wages because as Petitioner concedes, "the owner of JL Builders confirmed that the company has accommodated [P]etitioner's needs." *Id.* at 8. Petitioner's claim for lost wages is based on work as an independent contractor, but Respondent noted that "he has not demonstrated that he was forced to reject or withdraw from any specific contracts as a result of his 2018 SIRVA injury." *Id.* Respondent then listed several examples of evidence that could be used to "verify [Petitioner's] employment or stated income, including but not limited to[,] tax returns, pay stubs, a terminated contract, and/or letter of withdrawal." *Id.* Respondent asserted that Petitioner did not lose any potential contracts, because his work as a contractor was prior to obtaining "his full-time supervisory position with JL Builders." *Id.* Respondent reasoned that Petitioner's financial expert "did not contemplate [P]etitioner's steady income, as [P]etitioner was not hired by JL Builders until April [of] 2018." *Id.* Furthermore, Respondent noted that Petitioner's treaters had not limited his employment "due to his medical needs, or otherwise indicat[ed] that he was medically unable to continue his work." *Id.* at 9.

Respondent discounted Petitioner's claims that therapy and surgery caused him to miss so much work that he stopped attending PT. *Id.* Respondent asserted that Petitioner "has not submitted any evidence showing that he missed work in the weeks and months immediately following his vaccination, when he underwent surgery, or when his SIRVA [pain was most severe]." *Id.* Respondent also noted that Petitioner did not request compensation for "unpaid leave from his regular job." *Id.*

Respondent likened Petitioner's claim to three other cases wherein the petitioner received awards of $97,500.00, $105,000.00, and $118,000.00, respectively. *Id.* at 22–24 (citing *Shelton v. Sec'y of Health & Hum. Servs.*, No. 19-279V, 2021 WL 2550093 (Fed. Cl. Spec. Mstr. May 21, 2021) (wherein the petitioner delayed reporting shoulder pain, was treated for one year and eight months, attended twenty-six PT sessions, received three steroid injections, and underwent one surgery); *Weed v. Sec'y of Health & Hum. Servs.*, No. 18-1473V, 2021 WL 1711800 (Fed. Cl. Spec. Mstr. Mar. 30, 2021) (wherein the petitioner suffered a severe SIRVA lasting six months, requiring a surgery and nine PT sessions, but made a nearly full recovery); *Schmitt v. Sec'y of Health & Hum. Servs.*, No. 19-21V, 2021 WL 4470101 (Fed. Cl. Spec. Mstr. Aug. 30, 2021) (wherein the petitioner suffered a moderate to severe SIRVA, received two cortisone injections

over one year apart, attended PT, underwent one surgery, and could no longer lift heavy objects overhead)). Respondent argued that in all three of these cases, the "petitioners treated for less than one year; saw improvement with arthroscopic surgery; and largely recovered, albeit with some residual post-operative shoulder pain." *Id.* at 22.

### c. Petitioner's Reply

Petitioner responded to Respondent's arguments in his reply brief. Pet'r's Reply. Petitioner began by arguing that it is "common sense" that his neck swelling and facial numbness are the result of his vaccination. *Id.* at 1. He explained that "[t]he injection of any toxic substance into a portion of the human body where it is not intended, could in fact cause adverse reactions." *Id.* Petitioner further supported this point by citing one of his treater's statements that his neck masses are "likely reactive to his inflammatory reaction after his Tdap shot." *Id.* at 2 (citing Pet'r's Ex. 14 at 5).

Petitioner again argued that Respondent did not fully appreciate the comprehensive nature of his two-day FCE and relied too heavily on the discharge evaluation from Petitioner's orthopedic surgeon. *Id.* Petitioner also noted that the doctor's notes from his July 1, 2019 orthopedic follow-up indicated nerve damage to multiple peripheral nerve distributions, muscle weakness, and stiffness. *Id.* The FCE added that Petitioner suffered from lifting limitations as well as moderate impairment to the cervical spine and his RUE. *Id.* at 4. Petitioner highlighted the conclusions of the report, including that Petitioner suffers from "valid pain, loss of work capacity, and a loss of enjoyment of life activities." *Id.* at 5.

Petitioner rebutted Respondent's argument that Petitioner ended treatment because his condition resolved. *Id.* at 6. Petitioner asserted that his PT regimen ended because it could lead to no further improvement. *Id.* Petitioner summarily dismissed Respondent's inference that Petitioner suffered from an intervening injury, calling it a "baseless charge" of "pure speculation." *Id.* at 7.

Regarding his lost wages claim, Petitioner disputed Respondent's assertion that he provided no evidence in support of this claim. *Id.* at 8. Petitioner first asserted that building contractors commonly have several streams of income within the industry. *Id.* at 7–8. Petitioner continued that although he did not file supporting documents, that "information was provided to the expert accountant, and it is tendered that the expert accountant's report is the best evidence of lost wages." *Id.* at 8. Furthermore, Petitioner stated that this information, although not filed, "was submitted to [Respondent's counsel] during an attempt to amicably resolve the case." *Id.* In support of his lost wages and earnings potential request, Petitioner filed the letter containing said information, dated September 23, 2021. *Id.* at 12–16 (Exhibit A). He also filed copies of 1099 tax forms from 2017 and 2018. *Id.* at 17–18 (Exhibits 1–2). These forms included a tax record of payment from Precision Drilling Company in 2018 for $5,000.00 and First Data Reporting Services in 2018 for $64,016.00. *Id.* (Exhibits 1–2). The payments from First Data were detailed as monthly invoices in the following amounts: January – $1.00; February – $29,900.00; March – $14,100.00; April – $12,000.00; May – $5,815.00; June – $0.00; July – $0.00; August – $2,200.00; September – $0.00; October – $0.00; November – $0.00; and December – $0.00. *Id.* at 17 (Exhibit 1). Two 1099 forms from 2017 and 2018 recorded payment sums to Petitioner from Centre Crossing for $10,350.00 and $4,500.00, respectively. *Id.* at 19 (Exhibit 3).

Lastly, Petitioner contended that unlike his case, in all of the cases cited by Respondent, the petitioners had fast and nearly full recoveries and no perceived disability. *Id.* at 8–10. Petitioner noted in one of the cases, *Shelton,* the petitioner did not seek treatment for five months, compared to his treatment within two weeks. *Id.* at 8–9. The other two petitioners in *Weed* and *Schmitt* were able to return to hobbies, including swimming, whereas Petitioner is no longer able to swim in his pool. *Id.* at 9–10.

## VI.    Legal Standard

Once entitlement has been decided and damages are to be awarded, "each petitioner deserves an examination of the specific facts and circumstances in her or his case." *Sakovits v. Sec'y of Health & Hum. Servs.*, No. 17-1028V, 2020 WL 3729420, at *3 (Fed. Cl. Spec. Mstr. June 4, 2020). Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000.00." § 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment awarding such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." § 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22–23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematical formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula."); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("[T]he assessment of pain and suffering is inherently a subjective evaluation."). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No. 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues in his brief on damages, that practice was cast into doubt by the Court of Federal Claims several years ago. *See* Resp't's Resp. at 11. In *Graves*, Judge Merow rejected a special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory cap of $250,000.00. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579, 590 (2013). Judge Merow maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Graves,* 109 Fed. Cl. at 590. Instead, Judge Merow assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a

spectrum that ends at the cap. *Id.*

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case[]"). While "settled cases and proffers provide *some* evidence of the kinds of awards received overall in comparable cases," they are not as persuasive as reasoned decisions from a judicial neutral. *Sakovits*, 2020 WL 3729420, at *3 (emphasis in original). Taken as a whole, however, the data from earlier decisions can be helpful in awarding appropriate damages, particularly in SIRVA cases.

## VII.    Prior SIRVA Compensation Within SPU[20]

### A.    Data Regarding Compensation in SPU SIRVA Cases

SIRVA cases have an extensive history of informal resolution within the SPU. As of January 1, 2023, 3,031 SPU SIRVA cases have been resolved since the inception of SPU on July 1, 2014. Compensation was awarded in 2,950 of these cases, with the remaining 81 cases dismissed. Although this case was not assigned to the SPU, consideration of the SPU compensated cases can provide some insight on an appropriate damages award.

Of the 2,950 compensated cases, 1,677 SPU SIRVA cases involved a prior ruling that the petitioner was entitled to compensation. In only 148 of these cases was the amount of damages determined by a special master in a reasoned decision. The written decisions setting forth such determinations, prepared by neutral judicial officers (the special masters themselves), provide the most reliable precedent setting forth what similarly-situated claimants should also receive. *See, e.g.*, *Sakovits*, 2020 WL 3729420, at *4 (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

### B.    Pain and Suffering Awards in Reasoned Decisions

In the 148 SPU SIRVA cases which required a reasoned damages decision, compensation for a petitioner's actual or past pain and suffering varied from $40,000.00 to $210,000.00, with $90,000.00 as the median amount. Only seven of these cases involved an award for future pain and suffering, with yearly awards ranging from $250.00 to $1,500.00.[21]

In cases with lower awards for past pain and suffering, many petitioners commonly demonstrated only mild to moderate levels of pain throughout their injury course. This lack of significant pain is often evidenced by a petitioner's delay in seeking treatment – over six months

---

[20] All figures included in this section are derived from a review of the decisions awarding compensation within the SPU. All decisions reviewed are available publicly. All figures and calculations cited are approximate.

[21] Additionally, a first-year future pain and suffering award of $10,000.00 was made in one case. *Dhanoa v. Sec'y of Health & Hum. Servs.,* No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018).

in one case. In cases with more significant initial pain, petitioners usually experienced this greater pain for three months or less. Most petitioners displayed only mild to moderate limitations in ROM. MRI imaging showed evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema. Many petitioners suffered from unrelated conditions to which a portion of their pain and suffering could be attributed. These mild to moderate SIRVAs usually resolved after one to two cortisone injections and two months or less of PT. None required surgery. Except in one case involving very mild pain levels, the duration of the SIRVA injury ranged from six to thirty months, with most petitioners averaging approximately nine months of pain. Although some petitioners asserted residual pain, the prognosis in these cases was positive.

Cases with higher awards for past pain and suffering involved petitioners who suffered more significant levels of pain and SIRVAs of longer duration. Most of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and sought treatment of their SIRVAs more immediately, often within thirty days of vaccination. All petitioners with significant pain also experienced moderate to severe limitations in ROM. MRI imaging showed more significant findings, with the majority showing evidence of partial tearing. Surgery or significant conservative treatment, up to 133 PT sessions – occasionally spanning several years, and multiple cortisone injections, were required in these cases. In six cases, the petitioners provided sufficient evidence of permanent injuries to warrant yearly compensation for future or projected pain and suffering.

## VIII.   Appropriate Compensation for Petitioner's Pain and Suffering

### A.  Actual Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact his awareness of his injury. Therefore, I will address the remaining factors to be considered when determining an award for pain and suffering: the severity and duration of Petitioner's injury.

A review of his medical records reveals that from the date of vaccination on October 5, 2018, until his surgery on February 13, 2019, a period of approximately four months, Petitioner suffered from a moderate to severe SIRVA. He reported his injury to his vaccine administrator quickly, within two weeks of vaccination. He consistently reported severe pain with no indication that the steroid pack and two steroid injections he received offered any relief. Despite Petitioner's inability to undergo an MRI, it was quickly determined that Petitioner needed surgery. His arthroscopic surgery included nerve decompression and acromioplasty, and Petitioner reported diminished symptoms in his post-surgical follow up.

Following his surgery, Petitioner underwent twenty-two sessions of PT over approximately three months, wherein he continued to report moderate pain. At the time of discharge from PT in May of 2019, Petitioner exhibited a 39% perceived disability and pain levels that ranged from 3/10 to 6/10 with overuse. A follow-up record from his July 1, 2019 orthopedic exam, approximately eight and one-half months post vaccination, recorded that his full ROM and strength had returned. Petitioner's FCE administered in April of 2021, documented moderate loss of ROM and pain when reaching overhead. All of Petitioner's records consistently note that while his pain levels have

decreased and ROM increased, he has not experienced full recovery.

There are no medical records that document Petitioner's pain levels or ROM between July of 2019 until April of 2021. Petitioner asserts that his 2021 FCE examination was more thorough and therefore more accurate than the exams performed by his treaters in 2019. However, the purpose of each treater examination is of some consequence. Petitioner's PT discharge exam in May of 2019, as well as his follow up orthopedic exam in July of 2019, were done for the purpose of treatment and diagnosis. Indeed, the sole purpose of both was to evaluate Petitioner's ability to work and safely engage in activities of daily living ("ADLs"). In Program cases, contemporaneous medical records and the opinions of treating physicians are favored. *Capizzano v. Sec'y of Health & Hum. Servs.*, 440 F.3d 1317, 1320 (Fed. Cir. 2006) (citing *Althen v. Sec'y of Dep't of Health & Hum. Servs.,* 418 F.3d 1274, 1278–80 (Fed. Cir. 2005)). This is because "[m]edical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993). They are not, however, "binding on the special master or court." § 13(b)(1). Rather, when "evaluating the weight to be afforded to any such . . . [evidence], the special master . . . shall consider the entire record . . . ." *Id.*

Petitioner's records of his condition post surgery in 2019 consistently noted continued mild levels of right shoulder pain exacerbated by overuse. The FCE completed in 2021 suggests a worsening of Petitioner's ROM and increased pain levels; however, this report was completed in contemplation of litigation and several years post injury, treatment, and therapy discharge. Therefore, it does not carry the premium afforded to Petitioner's medical records. Petitioner's filed affidavits likewise do not provide information indicating a worsening of Petitioner's condition after his 2019 treatment and prior to his 2021 FCE. After consideration of the evidence, I do not find there is preponderant evidence that Petitioner's injury is worse than described in his 2019 medical records. Nonetheless, Petitioner has provided preponderant evidence that his injury is not completely resolved and that some of his prior ADLs and hobbies are no longer available to him.

Petitioner's claim for pain and suffering also contemplates damages for the neck condition that is documented in Petitioner's record. While it may be that Petitioner has presented evidence that his neck injury could be a vaccine injury, the damages phase of litigation is not the appropriate time to assert causation. Respondent was very clear in all of his filings, from his Rule 4(c) report through his damages response, that his concession was limited to Petitioner's SIRVA and related sequelae. Petitioner did not file a claim for a neck, skin, or other injury that provided a but-for causation theory, nor did Petitioner provide a logical sequence of cause and effect to show how his Tdap vaccination caused said injury. Petitioner resolved his case short of litigation as a Table SIRVA claim. He cannot now seek to add an injury that has not been litigated or conceded for damages. *See Danielson v Sec'y of Health & Hum. Servs.*, No. 18-1878V, 2020 WL 8271642, at *4 (Fed. Cl. Spec. Mstr. Dec. 29, 2020) (rejecting the petitioner's argument that she should receive a higher damages award covering prior and continued pain in areas other than the left shoulder where she received her vaccination and subsequently awarding a lower award limited to her SIRVA). I therefore do not find it appropriate to consider Petitioner's neck injury at this stage in his claim.

For analogy, Petitioner offers two cases, *Hooper* and *Pruitt*, wherein the petitioners undergo substantially more intense treatment. By Petitioner's own account, the *Hooper* petitioner's surgery was more extensive. He attended sixty-six physical therapy sessions (compared to Petitioner's twenty-two) and suffered a 50% disability (Petitioner suffered a 39% disability). *Hooper,* 2019 WL 1561519, at *5. The *Pruitt* petitioner's injury spanned over two years and required two surgeries. *Pruitt,* 2021 WL 5292022, at *10. In the present case, Petitioner's significant injury resolved within one year of his vaccination and within four months following his single surgery. Based on Petitioner's symptomology, progression, and treatment, I do not find that Petitioner's case is analogous in severity to those he relied upon for support.

Likewise, Respondent's reliance on *Shelton* is misplaced, given the delay in treatment and the complete injury resolution compared to that of Petitioner. Respondent's other cited cases are more instructive; however, they do have some significant distinctions. It is notable that all of the cases Respondent relies on to argue against a high award of pain and suffering have substantially larger award amounts ($97,000.00, $105,000.00, and $118,000.00) than the $82,500.00 that Respondent is proposing here. In *Weed*, the petitioner suffered a severe initial injury, but her surgery was performed less than two months post vaccination. *Weed,* 2021 WL 1711800, at *5. Ultimately, the petitioner had a "strong and relatively quick recovery," including only nine PT sessions, and her pain peaked at a 3/10. *Id.* Respondent's third referenced case, *Schmitt*, is relevant because of the petitioner's "moderate to severe initial pain and limited [ROM], [immediate] medical attention[,] and [prompt] surgery." *Schmitt,* 2021 WL 4470101, at *8. In that case, the petitioner was able to control his pain with over-the-counter medications, and after four PT sessions, "he had significantly less pain and no documented limitations." *Id.* at *6. Indeed, the Chief Special Master noted that his "review did not locate any SIRVA injury case involving a reasoned determination of damages which culminated in an award of less than $100,000.00 for past pain and suffering." *Id.* While *Weed* and *Schmitt* are certainly similar to Petitioner's case with respect to the initial severity and clinical progression, they do not share his longer course of PT or permanent disability at discharge and are therefore distinguishable.

A review of prior reasoned SIRVA decisions also informs my analysis of Petitioner's pain and suffering claim. The *Roberson* case is analogous to Petitioner's in that Mr. Roberson had severe pain and sought treatment immediately. *Roberson v. Sec'y of Health & Hum. Servs.,* No. 19-90V, 2020 WL 5512542, at *4 (Fed. Cl. Spec. Mstr. Aug. 7, 2020). Mr. Roberson received two steroid injections prior to surgery and completed twenty-one PT sessions post surgery with a good prognosis and nearly full ROM. *Roberson,* 2020 WL 5512542, at *4. Like Petitioner, Mr. Roberson's significant pain was resolved within one year. *Id.* The *Reynolds* case is also instructive because of Mr. Reynolds' similar prognosis to that of Petitioner. *Reynolds v. Sec'y of Health & Hum. Servs.,* No. 19-1108V, 2021 WL 3913938 (Fed. Cl. Spec. Mstr. July 29, 2021). Six months post surgery, Mr. Reynolds "had limitations with lifting his arm away from the body and overhead." *Reynolds,* 2021 WL 3913938, at *6. Like Petitioner, he "had a permanent shoulder injury which could be aggravated by excessive activity[,] and [] no particular [further] treatment was indicated." *Id.* Lastly, there is *Randazzo*, in which the petitioner's length of significant pain at six months is closer to the eight and a half months in the present case. *Randazzo v. Sec'y of Health & Hum. Servs.,* No. 18-1513V, 2021 WL 829572 (Fed. Cl. Spec. Mstr. Feb. 1, 2021). In *Randazzo*, the petitioner had a cortisone injection, surgery, and twenty-two PT sessions with a good prognosis. *Randazzo*, 2021 WL 829572, at *3. All three of these cases share some similarities with Petitioner's case, although they also differ in some respects. The three petitioners were each

awarded $125,000.00 in actual pain and suffering. I find that to be a reasonable award amount in this case as well.

### B. Future Pain and Suffering

Petitioner's argument for future pain and suffering consists of a single statement with no requested amount. He only noted that "[a]n award for future pain and suffering could be in order as well, given the ongoing nature of his injuries." Pet'r's Br. at 14. Petitioner referenced two prescription drugs that he uses to treat his continued SIRVA pain, but Petitioner has also relied on these medications to treat chronic headaches prior to his vaccination. He has provided no evidence that the dosage was increased or the instructions from his treater were expanded to also address his shoulder pain. More so, Petitioner no longer receives treatment for SIRVA, and he was discharged from PT. Petitioner's damages brief lacks a specific request or any argument in support of future pain and suffering, and, without more, I do not find that it is appropriate in this case.

### C. Lost Wages Claim

Mr. Lee's affidavit noted Petitioner began working for him as a site supervisor on April 1, 2018. Following Petitioner's SIRVA in October of 2018, Mr. Lee made accommodations for Petitioner that has allowed him to continue to work without interruption, as reflected in the lack of a lost wages claim with respect to his employment by JL Builders. Petitioner and Mr. Lee emphasized the projects Petitioner lost as an independent contractor, specifically, the four clients that "had to be released to find someone else to do their work." *See* Pet'r's Ex. 24 at 6–7. To illustrate his lost wages, Petitioner filed tax documents that require further discussion. Petitioner filed two 1099 forms, documenting payments from his client, Centre Crossing, in 2017 of $10,350.00, and in 2018 of $4,500.00. Pet'r's Reply at 19 (Exhibit 3). The amount Petitioner was paid in 2017 appears to be approximately twice what Petitioner received in 2018, the year he began working for Mr. Lee. There is no evidence in the record that Petitioner worked and received payment as a site supervisor in 2017. That he was not employed full-time for Mr. Lee and JL Builders until April of 2018 would explain why he would have been able to work more hours for Centre Crossing in 2017 as an independent contractor and collect a higher payment. Petitioner asserted that he had to stop working as an independent contractor after his vaccination in October of 2018, but there is insufficient evidence that Petitioner's work in October, November, and December of 2018 would have been substantial enough to amount to the difference between his 2017 payment and his 2018 payment from Centre Crossing.

Petitioner's earning potential as an independent contractor during those months is better illustrated by Petitioner's First Data Reporting Services 1099 form from 2018. *Id.* at 17 (Exhibit 1). The payments received by Petitioner from First Data Reporting Services in 2018 are listed by month on his 1099 form. *Id.* In February and March of 2018, prior to Petitioner's employment with JL Builders, Petitioner received payments of $29,900.00 and $14,100.00, respectively.[22] *Id.* Petitioner began with JL Builders on April 1, 2018, and received payments from First Data in April and May of that year in the amount of $12,000,00 and $5,815.00, respectively. *Id.* Petitioner did not receive his vaccination until October of 2018. However, his 1099 form lists no payments in

---

[22] Petitioner did not receive a payment in January of 2018.

June, July, or September of that year. *See id.* Petitioner received a small payment of $2,200.00 in August of 2018. *Id.* Petitioner received no further payments for the duration of 2018. *Id.*

Petitioner's vaccination cannot account for the steady decrease in payment amounts each month and the cessation of payment during peak summer months pre vaccination. Given the unpredictable nature of construction, it is conceivable that Petitioner was unable to obtain contracts during these months. It cannot be ignored, however, that Petitioner's start date with JL Builders in April of 2018, prior to his vaccination, signals the logical beginning of decreased work as an independent contractor. Petitioner did not explain or provide any evidence that the independent contract work he did for Centre Crossing or Precision Drilling[23] during 2018 was completed simultaneously with his full-time employment by JL Builders. Petitioner did not provide the contracts with any of these companies or any additional information that would support his claim that he could have continued the same volume of business as an independent contractor, despite the addition of his recent full-time employment as a site supervisor.

Petitioner asserted instead that employment documentation is irrelevant or not needed because "[t]his information was provided to the expert accountant, and it is tendered that the expert accountant's report is the best evidence of lost wages." *Id.* at 8. Petitioner further asserted that documentation in support of his lost wages demand "was submitted to [Respondent's counsel] during an attempt to amicably resolve this case." *Id.* Petitioner is correct that his submissions to his expert and Respondent that were not filed in the case are irrelevant to my decision. I cannot consider what is not before me. Furthermore, it is perplexing why Petitioner would intentionally withhold presumably favorable evidence in his possession and simply pronounce that the expert's report is the best evidence. Experts are often an essential piece of a petitioner's claim. However, nothing requires the acceptance of an expert's conclusion "connected to existing data only by the *ipse dixit* of the expert," especially if "there is simply too great an analytical gap between the data and the opinion proffered." *Snyder v. Sec'y of Health & Hum. Servs.*, 88 Fed. Cl. 706, 743 (2009) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)); *see also Isaac v. Sec'y of Health & Hum. Servs.*, No. 08-601V, 2012 WL 3609993, at *17 (Fed. Cl. Spec. Mstr. July 30, 2012), *mot. for review den'd*, 108 Fed. Cl. 743 (2013), *aff'd*, 540 F. App'x. 999 (Fed. Cir. 2013). Petitioner's expert does not address the discernible pattern of decreasing earnings prior to Petitioner's vaccination in his report, nor does Petitioner address it in his reply brief. This omission is puzzling as it was expressly identified by Respondent in his response. Petitioner has not presented preponderant evidence that he worked simultaneously as a full-time site supervisor and a full-time independent contractor, and therefore would have been paid for working two full-time jobs. Indeed, the evidence filed illustrates a decline in Petitioner's consulting work that correlates with his JL Builders employment, obtained pre vaccination. Therefore, I do not find that a lost wages award is appropriate in this case.

## IX.    Conclusion

For all of the reasons discussed above and based on consideration of the record, **I find that $125,000.00 represents a fair and appropriate amount of compensation for Petitioner's**

---

[23] Precision Drilling was a third company who hired Petitioner as a contractor in 2018 and issued a 1099 in the amount of $5,000.00. Pet'r's Br. at 18 (Exhibit 2).

**actual pain and suffering.**[24] **I also find that Petitioner is entitled to $1,323.78 in actual recoverable out-of-pocket expenses. Therefore, I award a lump sum payment of $126,323.78 in the form of a check payable to Petitioner.** This amount represents compensation for all damages that would be available under § 15(a).

The Clerk of the Court is directed to enter judgment in accordance with this Decision.[25]

**IT IS SO ORDERED.**

<u>s/Herbrina D. Sanders</u>
Herbrina D. Sanders
Special Master

---

[24] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* § 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[25] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.